UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

WENDIE DREVES,                          :
                                        :
                    Plaintiff,          :
                                        :        Case No. 2:11-cv-4
          v.                            :
                                        :
HUDSON GROUP (HG) RETAIL, LLC,          :
                                        :
                    Defendant.          :
                                        :

## Opinion and Order

Wendie Dreves asserts that her former employer, Hudson Group (HG) Retail, LLC ("Hudson") (1) violated federal and Vermont equal pay provisions[1] by paying her male successor more than it paid her; (2) understaffed its Burlington operations in a manner that constituted age and gender discrimination[2] and required her to perform extra work for which she has not been compensated; (3) wrongfully and discriminatorily discharged her; and (4) failed to pay her for unused vacation time within 72 hours of her discharge.  Dreves voluntarily withdrew her wrongful and discriminatory discharge claims, to which her husband was also a party, *see* Stipulation to Dismiss Claims in Count III of Plaintiff's First Am. Compl., ECF No. 86, but the

---

[1] The Equal Pay Act of 1963 ("EPA"), Pub. L. 88-38, 77 Stat. 56, codified as amended, at 29 U.S.C. § 206(a)(1); Fair Employment Practices Act ("VFEPA"), Vt. Stat. Ann. tit. 21, § 495(a)(8) (2009).
[2] *See* The Age Discrimination in Employment Act of 1967 ("AEDA"), Pub. L. 90-202, 81 Stat. 602, codified as amended, at 29 U.S.C. § 623(a)(1); VFEPA, at §495(a)(1).

other claims remain.  Before the Court are Dreves's Motion for
Partial Summary Judgment on her equal pay claim under the
Vermont Fair Employment Practices Act ("VFEPA"), ECF No. 81, and
Hudson's Motion for Summary Judgment on all pending claims, ECF
No. 88.

    For the reasons explained below, the Court grants in part
and denies in part Dreves's motion for partial summary judgment.
Dreves's motion is granted with respect to Hudson's liability
under her Vermont equal pay claim but denied insofar as it
pertains to damages.  The Court also grants in part and denies
in part Hudson's motion for summary judgment.  Hudson's motion
is granted with respect to Dreves's employment discrimination
and quasi-contract claims but denied in respect to Dreves's
equal pay and unpaid wages claims.

BACKGROUND[3]

## I.  Dreves's Employment

    Hudson employed Dreves as the general manager of its retail
operation at Burlington International Airport from September 22,
2003, until September 8, 2010, when Hudson terminated her and

---

[3] Pursuant to Local Rule 56(a), both parties have filed statements of
undisputed fact along with their respective motions for summary
judgment.  For ease of reference, Plaintiff's Statement of Undisputed
Facts, ECF No. 81-1, will be cited as "Pl.'s Stmt." and Defendant's
Statement of Undisputed Facts, ECF No. 88-3, will be cited as "Def.'s
Stmt."  On summary judgment, the Court "construe[s] the facts in the
light most favorable to the non-moving party and must resolve all
ambiguities and draw all reasonable inferences against the movant."
*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)
(internal quotation omitted).

replaced her with Jarrod Dixon.  Pl.'s Stmt. ¶ 1.  At the time
of her termination, Dreves was 58.  Before her seven years with
Hudson, Dreves spent 16 years in retail management: one year as
assistant manager in a fabric store in Wasilla, Alaska; five
years as an assistant manager and manager of Brooks pharmacy in
Burlington and St. Albans, Vermont; two years as a manager of
Jo-Ann Fabric in South Burlington, Vermont; five years as
manager of Spencer Gifts, also in South Burlington; and three
years as the general manager of the Burlington airport store
that was acquired by Hudson in 2003.  *Id.* ¶¶ 4, 6.

When she joined Hudson, Dreves's initial base salary was
$34,365, but she received several raises during her seven years
with the company.  *Id.* ¶ 15.  The responsibilities of the
general manager at Burlington International Airport grew during
Dreves's tenure, most notably in 2007, when Hudson added two
small stores behind the security checkpoint.  Def.'s Stmt. ¶ 7.
In July 2007, after the additions, Hudson increased Dreves's
salary to $45,505.  *Id.* ¶¶ 8-9.  Dreves's salary reached $48,230
in 2008, which is where it remained until she was terminated.
*Id.* ¶ 19.  According to Hudson, Ms. Dreves did not receive a
raise in 2009 because of poor performance; however, Dreves
disputes that assertion.  Pl.'s Resp. to Def.'s Stmt. ¶ 112, ECF
No. 98-1.  Dreves did not receive a raise in 2010 because of a
company-wide salary freeze.  Def.'s Stmt. ¶ 113.

Hudson's Senior Vice President of Operations, Mario Scorcia, became Ms. Dreves's direct supervisor in 2006. *Id.* ¶ 3.  Scorcia had the final say on hiring and firing decisions for the Burlington operations, but Nelson Nieves, Hudson's Regional Human Resource Manager, assisted in employment decisions and overseeing the Burlington operation. *Id.* ¶¶ 11, 15.  In response to several employees' complaints about Dreves, Nieves conducted two investigations in Burlington, one in the summer of 2009 and the second in January 2010.  *Id.* ¶ 21.  After speaking with nine different employees, Nieves concluded that Dreves gave unduly preferential treatment to some employees while treating others poorly; that she made inappropriate and abusive remarks to staff members, including commenting about their physical appearance and disclosing confidential medical information; and that she refused to give employees time off for illness unless they found their own replacements. *Id.* ¶ 22.  On February 23, 2010, after conferring with Scorcia, Nieves issued Dreves a formal warning that her abusive behavior would not be tolerated and notified her that any additional infraction would result in her termination. Def.'s Stmt. ¶¶ 62-63.  Following further complaints from other employees about Dreves, Scorcia terminated her on September 8, 2010.  *Id*. ¶¶ 82-83.  Hudson did not compensate her for three

days' pay and two weeks of unused vacation time until after she filed this suit.  Pl.'s Supp. Stmt. ¶ 121, ECF No. 98-1.

## II.  Dreves's Successor

While Hudson was preparing to terminate Dreves, Scorcia and Nieves identified Jarrod Dixon as the person they believed was best suited to assume her responsibilities in Burlington. Def.'s Stmt. ¶ 97.  Dixon, 42 years old at the time he replaced Dreves, started working at Hudson in 2004 as a magazine manager at Hudson's airport store in Manchester, New Hampshire.  Pl.'s Stmt. ¶ 11.  Hudson promoted Dixon first to warehouse manager and, in 2008, to assistant general manager.  *Id.* ¶¶ 11-12.  By 2010, Nieves and Scorcia considered Dixon to be the assistant general manager who was "next in line" for a promotion to general manager.  Def.'s Stmt. ¶ 98.  Dixon had a strong record as an assistant manager in Manchester and also had direct experience with the Burlington operations from visits to evaluate and help address problems with Hudson's operation there.  *Id.* ¶ 97.

Accordingly, Scorcia began preparing an offer to persuade Dixon to transfer to Burlington and assume the responsibilities of general manager.  Scorcia began by taking Dixon's existing salary of $36,575 and attempting to calculate a comparable salary for Burlington.  *Id.* ¶ 102.  Hudson did not have any generally applicable policy or practice of equalizing the after-

tax income of its employees to account for variations in state income rates, Pl.'s Stmt. ¶ 38, so Nieves assisted Scorcia by providing informal fact research to determine what differences existed between the two locations. Def.'s Stmt. ¶ 103.  Relying on a cost of living that was 12.6 percent higher in Burlington as well as a Vermont income tax rate of 9.5 percent where New Hampshire had none, Nieves calculated that Dixon's existing Manchester salary of $36,575 would have to be increased to $45,085 to give him a comparable salary in Burlington.  Pl.'s Stmt. ¶¶ 27-28.  That figure served as a starting point. Scorcia determined that more would be needed to induce Dixon to relocate his family, as his wife had a part-time job in Manchester and his children were in school there.  Def.'s Stmt. ¶ 107; Pl.'s Stmt. ¶ 54.  Scorcia added approximately $5,000 and offered Dixon $50,000 per year if he took the job.  Def.'s Stmt. ¶ 108.  Dixon turned down Scorcia's opening offer and told him that it was insufficient for him to move his family to Burlington.  *Id.* ¶ 109.  Dixon requested $55,000, but he and Scorcia met halfway and settled on a salary of $52,500.  *Id.* ¶ 110.  Hudson also compensated Dixon for $5,000 in moving expenses.  Pl.'s Stmt. ¶ 67.

Nieves's tax calculations proved to be incorrect.  The actual Vermont tax on Dixon's assistant manager salary of $36,575 would have been only $229, or 0.63 percent of his

salary.  *Id.* ¶ 37.  How Nieves arrived at the cost-of-living
assessment is unclear.  Nieves states that he calculated it by
comparing the house and food prices for Burlington and
Manchester; however, he does not remember what websites he
consulted nor does he have a record of how he made the
calculation.  Def.'s Stmt. ¶ 106; Pl.'s Stmt. ¶¶ 40-43.  Hudson
conducted no inquiry into Dixon's wife's employment or her
prospects for employment upon moving to Burlington.  Pl.'s Stmt.
¶¶ 64-65.

**III. Dreves's Claim of Discriminatory Understaffing**

     Dreves also alleges that Hudson discriminated against her
by deliberately understaffing its Burlington operation.
According to Dreves, she covered the gaps created by Hudson's
understaffing by working extra days as well as double shifts.
Pl.'s Resp. Def.'s Stmt. ¶ 70.

     The following table shows the total number of hours worked
by all of Hudson's Burlington employees during Dreves's last
three years as general manager as well as Dixon's first year:

| Year | General Manager | Total Hours | Total Hours Per Week |
|------|-----------------|-------------|----------------------|
| 2008 | Dreves | 21,901 | 421.17[4] |

---

[4] Dreves provided a similar table to the Court, but Dreves
miscalculated the total hours per week for both 2008 and 2009.  *See*
Pl.'s Resp. to Def.'s Stmt. ¶ 12.  The table displayed here assumes
that the total hours for both years are correct and divides by 52 to
reach the correct figures for those years.

| 2009 | Dreves | 17,292 | 332.54[4] |
|---|---|---|---|
| Jan. 2010 – Aug. 2010 | Dreves | 10,767 | 316.67 |
| Sept. 2010 – Aug. 2011 | Dixon | 19,374 | 372.58 |

Pl.'s Resp. Def.'s Stmt. ¶ 12.  Several times during Dreves's time as general manager of the Burlington operation, Nieves approved requests to hire new staff.  Def.'s Stmt. ¶ 15.  In 2008, Hudson was acquired by the Swiss company Dufry AG, which initiated cost-saving measures, including more careful management of payroll expenditures.  *Id.* ¶ 10.  In 2008 and 2009, Hudson imposed a company-wide hiring freeze, resulting in no expansion of staffing during those years.  *Id.* ¶ 86; Pl.'s Resp. Def.'s Stmt. ¶ 86 (not disputing this fact).  In 2010 and 2011, Hudson lifted the hiring freeze, but a "chill" remained in place to fill positions on an as-needed basis.  Pl.'s Resp. Def.'s Stmt. ¶ 12.  Two employees who were planning to leave Hudson in 2010 changed their minds upon learning that Dreves was being terminated; however, Hudson did not rescind offers to the replacements it had already lined up in anticipation of their departure, the result of which was two extra employees on the Burlington staff.  Def.'s Stmt. ¶ 88-89.

Hudson's Burlington sales during Dreves's last twelve months as general manager totaled $1.481 million but increased to a total of $1.667 million during Dixon's first twelve months

8

on the job.  Pl.'s Resp. Def.'s Stmt. ¶ 12.  In Hudson's view,
additional hirings after September, 2010 were justified by the
increased sales.  Def.'s Stmt. ¶ 94.

Dreves complains that Scorcia treated her "totally
differently than how he treated the guys" and "would talk down
to [her]."  Pl.'s Resp. to Def.'s Stmt. ¶ 12.  Dreves does not
identify any statements from Scorcia or Nieves that had any
bearing on her age or gender.  Dreves Dep. 152:13—158:15, June
28, 2011, ECF No. 88-6.  When asked to identify specific reasons
for her perception that she had been treated differently, Dreves
stated that on one instance, Scorcia required her to use her
vacation time in circumstances where he had not previously
required her to do so.  *Id.* 153:18—154:4.  On several occasions
beginning in 2006, Dixon and Paul Faria, the general manager of
Hudson's Manchester operation, visited Burlington at Scorcia's
request to assist Dreves in improving her performance.
According to Dreves, towards the end of her employment, Scorcia
was far more receptive to Dixon and Faria's ideas for improving
the Burlington operation, even though her suggestions were
similar to theirs.  *Id.* 154:25—158:5.

Dreves received positive performance evaluations prior to
2009.  Pl.'s Resp. Def.'s Stmt. ¶ 12.  One of Dreves's annual
performance reviews employed male pronouns, a product of a

9

default setting that automatically populated Hudson's forms with male, not female pronouns.  *Id.*

## DISCUSSION

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. § 56(a).  A fact is material if it could affect the outcome of the lawsuit; a dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249; *see also Wilson v. Nw. Mut. Ins. Co.,* 625 F.3d 54, 60 (2d Cir. 2010) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986)).  While the Court must draw all inferences from the facts in the light most favorable to the non-moving party, that party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight*, 802 F.2d at 12.

## I.   Equal Pay

"The Equal Pay Act, passed by Congress in 1963, prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for

10

'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting 29 U.S.C. § 206(d)(1)).  "The purpose behind the enactment of the EPA was to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work." *Id.*  To that end, Congress chose not to require individuals bringing equal pay claims to prove discriminatory intent. *See Ryduchowski v. Port Auth. of New York & New Jersey*, 203 F.3d 135, 142 (2d Cir. 2000) ("[U]nlike Title VII, the EPA does not require a plaintiff to establish an employer's discriminatory intent."); *Belfi*, 191 F.3d at 135 ("One of the main substantive differences between [the EPA and Title VII] . . . , is that the former provides strict liability while the later requires proof of discriminatory intent.").

The Vermont Fair Employment Practices Act ("VFEPA") contains an equal pay provision that is virtually identical to the EPA.[5]  *See* Vt. Stat. Ann. tit. 21, § 495(a)(8) (prohibiting employers from discriminating "on the basis of sex by paying wages to employees of one sex at a rate less than the rate paid

---

[5] What differences exist between the two provisions, such as the length of the statute of limitations, the inclusion or exclusion of a good faith exception for liquidated damages, and the rate of prejudgment interest, are immaterial at this juncture.

to employees of the other sex for equal work that requires equal skill, effort, and responsibility, and is performed under similar working conditions."). The VFEPA grants employers the same four affirmative defenses as the EPA, *id.* § 495(a)(8)(A), and Vermont courts construe provisions of the VFEPA in accordance with the federal anti-discrimination laws on which they were modeled. *See, e.g., Robertson v. Mylan Labs., Inc.*, 2004 VT 15 ¶ 41 n.8, 848 A.2d 310, 327 n.8. Accordingly, this Court may avail itself of federal precedent when interpreting the equal pay provision of the VFEPA. *Lavalley v. E.B. & A.C. Whiting Co.*, 692 A.2d 367, 369 (Vt. 1997) ("[F]ederal decisions represent persuasive authority on the proper interpretation of FEPA.").

To state a *prima facie* case under both the federal and Vermont provisions, a plaintiff must show that "'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'" *Belfi*, 191 F.3d at 135 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995)); *Robertson*, 2004 VT at ¶ 41, 24 A.2d at 1130 n.8 (citing *Belfi*, 191 F.3d at 139-40)). Once a plaintiff has made a *prima facie* case, the burden shifts to the employer to establish one of four affirmative defenses: that the pay difference is due to

12

a seniority system, a merit system, a system that measures
quantity or quality of production, or "any factor other than
sex." *Belfi*, 191 F.3d at 136.

To establish the factor-other-than-sex defense, an employer
must show that "a *bona fide business-related reason* exists for
using the gender-neutral factor that results in a wage
differential . . . ." *Aldrich v. Randolph Cent. Sch. Dist.*, 963
F.2d 520, 526 (2d Cir. 1992) (emphasis added).  This requires
demonstrating that the pay disparity was based *solely* on factors
other than sex.  *See Timmer v. Michigan DOC*, 104 F.3d 833, 844
(6th Cir. 1997) ("[A]s with all affirmative defenses under the
Act, the employer must prove that sex provides no part of the
basis for the wage differential.")  (internal quotation marks
omitted); *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th
Cir. 1994) ("In fact, defendants must show that the factor of
sex provided no basis for the wage differential.").  The
employer carries the burden of persuasion, not just production,
in asserting this defense.  *Flaherty v. Massapequa Pub. Sch.*,
752 F. Supp. 2d 286, 299 (E.D.N.Y. 2010) *aff'd*, 462 F. App'x 38
(2d Cir. 2012).  That burden "is a heavy one, because the
statutory exemptions are narrowly construed." *Ryduchowski*, 203
F.3d at 143 (internal quotations and citations omitted).  Should
the employer carries its burden, the employee may then claim
that the factor put forward is simply pretext and show that the

employer did not use the factor "reasonably in light of the employer's stated purpose as well as its other practices." *Aldrich*, 963 F.2d at 526.

Hudson concedes that Dreves has established a prima facie case under the VFEPA; however, the parties dispute whether Hudson has presented the Court with a valid "factor other than sex" that explains the differential in pay between Dreves and her male successor, Dixon.[6]  To avoid summary judgment for Dreves, Hudson has the burden of showing that the facts viewed in its favor demonstrate that factors other than sex could explain the entirety of the pay disparity between Dreves and Dixon.  The parties disagree vehemently about the extent of the pay disparity, but the question at this stage can be broken down into two straightforward components: First, what is the smallest disparity between what Hudson paid Dreves and what it paid Dixon that the facts, viewed in the light most favorable to Hudson, support?  Second, has Hudson proffered valid factors other than sex that explain the entirety of that gap?

_____

[6] A successor may serve as a comparator for the purposes of an equal pay claim. *See generally Knight v. G.W. Plastics, Inc.*, 903 F. Supp. 674, 679 (D. Vt. 1995) ("'[T]he employees whose pay is the subject of comparison may hold jobs in succession as well as simultaneously.'") (quoting *Pearce v. Wichita County*, 590 F.2d 128, 133 (5th Cir. 1979)); *Sinclair v. Auto. Club of Oklahoma, Inc.*, 733 F.2d 726, 729 (10th Cir. 1984) ("The Act applies to situations in which an employer hires an employee of one sex for a particular job to replace an employee of the opposite sex.").

14

Dreves asks the Court to compare the difference between her starting salary in 2003 and Dixon's starting salary in 2010; however, the responsibilities of the general manager expanded in 2007.  For that reason, Dreves's 2007 salary of $45,505 is the earliest one that reflects the exact responsibilities that Dixon assumed in 2010.  Adjusting for inflation, Dreves's 2007 salary was $47,561 in 2010 dollars.[7]  The pay gap that must be explained by factors other than sex is $4,939, the difference between Dixon's starting salary of $52,500 and $47,561.

Nonetheless, the Court is cognizant of the fact that Dreves's 2007 salary may also have taken into account her substantial experience as a general manager in Burlington, experience that Dixon did not have when he started in 2010. From this standpoint, the difference between Dreves's 2007 salary and Dixon's 2010 salary may very well understate the extent of the pay disparity between the two because it does not take into account the fact that she had much more experience. Because the Court must view the facts most favorably to Hudson, the Court makes no attempt to factor Dreves's greater experience at this juncture; however, Dreves is not foreclosed from arguing

---

[7] Hudson need not explain the portion of the pay differential caused by inflation.  To calculate the adjusted salary, the Court employed the Chained Consumer Price Index ("C-CPI-U"), US city average.  *See* Bureau of Labor Statistics, Consumer Price Index - Chained Consumer Price Index, All Urban Consumers, available at http://www.bls.gov/cpi/data.htm (last visited May 23, 2013). According to this index, the total inflation between July, 2007 and September, 2010 was 4.53 percent.  *Id*.

that her experience relative to Dixon should factor into a calculation of damages.

### A.   Cost-of-Living Adjustments

Hudson first argues that even though its cost-of-living adjustments were inaccurate, they help explain the difference between Dreves and Dixon's salaries.  Generally speaking, an employer's attempt to match an employee's previous earnings may serve as a valid justification for a pay disparity.  *See, e.g., Heinemann v. Howe & Rusling*, 529 F. Supp. 2d 396, 417 (W.D.N.Y. 2008) (denying summary judgment because there were material issues of fact regarding whether the male comparator's prior work experience and salary history were responsible for the pay disparity).  Here, the Court takes Hudson's cost-of-living adjustments at face value and assumes that they explain how Nieves and Scorcia determined that a salary of $45,085 in Burlington was comparable to a salary of $36,575 in Manchester. But Hudson's justification of how it adjusted Dixon's salary from $36,575 and $45,085 is immaterial at this juncture because the difference it must explain is the one between $47,561 and $52,500.  Thus, though the parties dispute issues relating to the cost-of-living adjustments, such as whether they were *bona fide* or pretextual, those disputes do not preclude summary judgment for Dreves because they are unrelated to the gap Hudson must explain.

16

B.    **Inducement**

Hudson also argues that approximately $5,000 of the $50,000 salary it originally offered Dixon reflected an inducement for him to take the job.  By itself, mere "inducement" is insufficient to justify a pay discrepancy; courts employing the term uniformly discuss inducement in conjunction with other factors, such as a candidate's particular experience or qualifications.  *See, e.g., Moll v. Telesector Res. Grp., Inc.*, 04-CV-805S, 2012 WL 1935087 at *31 (W.D.N.Y. May 29, 2012), as amended (May 30, 2012) (noting that a male comparator's higher salary reflected his lengthy management experience as well as an inducement for him to accept a transfer); *Byrne v. Telesector Res. Grp., Inc.*, 04-CV-0076S, 2007 WL 962929 (W.D.N.Y. Mar. 29, 2007) (noting that a male comparator with greater experience would not agree to transfer without inducement) *aff'd,* 339 F. App'x 13 (2d Cir. 2009); *Mazzella v. RCA Global Commc'ns, Inc.*, 642 F. Supp. 1531, 1551 (S.D.N.Y. 1986) (coupling inducement with prior compensation, lengthy experience with the employer, as well as the employee's particular skills).

Hudson characterizes Dixon's salary as one that was intended to induce a candidate with significant management experience and familiarity with the Burlington operation to take the job and relocate his family.  In Hudson's view, inducement, in conjunction with these considerations, demonstrates that the

17

pay disparity between Dreves and Dixon was the result of a valid
factor other than sex.

### 1.   Experience

A comparator's past work experience does not justify a pay
differential simply because those experiences make him well-
suited for his position; rather, the comparator's experience
must justify the employer's decision to pay the comparator more
than another employee who is doing the same work.  It is
therefore the comparator's experience *vis-à-vis* the claimant
that is salient.  *See, e.g., Byra-Grzegorczyk*, 572 F. Supp. 2d
at 253 (noting the comparator's ten years of experience with the
employer in contrast to the plaintiff, who was a new employee);
*Virgona v. Tufenkian Imp.-Exp. Ventures, Inc.*, 05-cv-10856, 2008
WL 4356219 at *10 (S.D.N.Y. Sept. 23, 2008) (contrasting the
comparator's twelve years of experience, some as a comptroller
and manager, with the plaintiff's seven to ten years of
experience, none of which was as a comptroller).

In this case, Hudson argues that Dixon's six years of
experience with the company in several managerial roles as well
as his direct experience in Burlington made him the ideal
candidate to replace Dreves as general manager of the Burlington
operation.  While Nieves and Scorcia may have recognized that
Dixon's experience may have made him suited to replace Dreves,
it does not justify paying Dreves less for the same work.

18

Dreves had much more experience than Dixon.  At the time she was fired, Dreves had spent 23 years in retail management, ten of which were as the general manager at Burlington International Airport.  To the extent that Dreves and Dixon's relative experience justified a pay disparity, it should have favored Dreves, not Dixon.  For this reason, Hudson has not met its burden of persuasion in establishing that the disparity between Dreves's and Dixon's pay is explained by its attempt to induce a more qualified employee to take a position.

### 2.  Dislocation of Dixon's Wife and Family

Hudson also submits that the approximately $5,000 of "inducement" reflected a need to compensate Dixon for having to relocate his family to Burlington from Manchester, where his children were in school and his wife was employed part-time.[8]  As explained above, to constitute a valid factor-other-than-sex defense, an employer's justification for a pay disparity must be business-related.  Without this requirement, "the factor-other-than-sex defense would provide a gaping loophole in the statute through which many pretexts for discrimination would be sanctioned."  *Aldrich*, 963 F.2d at 525.  Although the Second Circuit has not defined when a factor is "business-related" with any precision, the Eleventh Circuit has explained that it

---

[8] The salary increase was not meant to compensate Dixon for the move itself, as Hudson gave Dixon a one-time $5,000 stipend for moving expenses.

includes the "unique characteristics of the same job;" an
"individual's experience, training, or ability"; or "special
exigent circumstances connected with the business." *Glenn v.
Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988).[9]
Applying that definition, the Court finds that Hudson has not
met its burden of showing that its consideration of Dixon's
family circumstances was related to any unique characteristics
of his position, his qualifications or abilities, or any exigent
circumstances associated with Hudson's operation.[10]  For this
reason, Hudson's "inducement" of Dixon to move his family is not
a valid defense to Dreves's equal pay claim.

   **C.  Negotiation**

   Finally, Hudson suggests that its salary negotiation with
Dixon constitutes a factor other than sex that justifies paying
him more than it paid Dreves.  Dixon turned down Scorcia's
initial offer of $50,000, told him that he would only relocate
to Burlington for a higher sum, and eventually accepted $52,500.

---

[9] The Eleventh Circuit's articulation of the business-relatedness
requirement is consistent with the Second Circuit's insistence that
the statutory defenses to equal pay claims be "narrowly construed."
*Ryduchowski*, 203 F.3d at 143.
[10] In an unpublished *per curiam* decision, the Fifth Circuit considered
the fact that both the employee bringing an equal pay claim and the
comparator had been compensated for having to relocate.  *Wallace v.
Louisiana Bd. of Sup'rs for Louisiana State Univ. Agr. & Mech. Coll.*,
364 F. App'x 902, 903 (5th Cir. 2010).  That decision provides little
support for the notion that an employer may consider the impact of the
comparator's relocation, and its relevance is further diminished by
the fact that the Fifth Circuit—in contrast to the Second—does not
require that a "factor other than sex" be business-related.

By this theory, Hudson claims that regardless of the other factors it cites, Dixon's rejection of their initial offer of $50,000 is sufficient to establish that the disparity between his starting salary and Dreves's 2007 salary was based solely on factors other than sex.

The problem is that Hudson must do more than identify the process by which it arrived at Dixon's ultimate salary of $52,500; Hudson must justify the disparity between what it paid Dixon and what it paid Dreves.  From this standpoint, Hudson's use of its negotiation with Dixon as a defense has two shortcomings.  First, it ignores the fact that Hudson's initial offer of $50,000 was itself unattributable to any factor other than sex.  If Dixon had simply accepted that offer, the negotiation would have resulted in a salary that is unjustified by any of the other factors Hudson cites.  It would be strange indeed if an indefensible disparity could be transformed to a defensible (and larger) one whenever a comparator asked for more money than was originally offered, particularly since am employer's initial offer is likely to anchor the entire negotiation and affect the size of any counter-offer or demand by the employee.  *See generally* Henrik Kristensena and Tommy Gärlinga, "The Effects of Anchor Points and Reference Points on Negotiation Process and Outcome," 71 *Org. Behav. & Hum. Decision Processes* 85 (1997).  That Dixon demanded a salary of $55,000

and settled for a salary of $52,500 after Hudson had offered
$50,000 does not mean that, *ex ante*, he would have refused a
lower salary if he knew it was a final offer.  After all, had
Dixon received Dreves's inflation-adjusted 2007 salary of
$47,561, it would have amounted to a thirty percent raise for
Dixon—hardly an insignificant increase.

Second, there is simply no basis for the proposition that a
male comparator's ability to negotiate a higher salary is a
legitimate business-related justification to pay a woman less.
To hold otherwise would eviscerate the federal and Vermont equal
pay provisions.  It would also require the Court to accept a
theory that is essentially indistinguishable from the repudiated
argument that employers are justified in paying men more than
women because men command higher salaries in the marketplace.
*See Corning Glass Works v. Brennan*, 417 U.S. 188, 205 (1974)
("That the company took advantage of [a job market in which it
could pay women less] may be understandable as a matter of
economics, but its differential nevertheless became illegal once
Congress enacted into law the principle of equal pay for equal
work.").  Reliance on the difference in value that the market
places on women and men "became illegal once Congress enacted
into law the principle of equal work for equal pay."  *Id.*  In
this Court's view, a pay disparity is no more justified when it
is the result of a single negotiation than when it is the result

22

of a market-wide phenomenon, for what is a marketplace other
than an amalgamation of many negotiations?  Permitting an
employer to defend itself simply by showing that a disparity was
the product of one negotiation with a male employee would lead
to the same result: a marketplace that values the work of men
and women differently.[11]

*          *          *

In sum, Hudson has failed to meet its burden of
establishing a factor other than sex or combination of factors
other than sex that are sufficient to explain the pay disparity
between Dreves and Dixon, even when all the facts and inferences
are viewed in the light most favorable to Hudson.  For that
reason, Dreves is entitled to summary judgment on the issue of
liability with respect to her equal pay claim under the VEFPA.[12]
Nonetheless, factual disputes concerning Dreves's damages
persist, so Dreves is not entitled to summary judgment on that
portion of her claim.  Hudson's motion for summary judgment

---

[11] The Court notes that there are a number of studies that suggest that
gender plays a significant role in negotiation outcomes.  *See, e.g.,*
Hannah Riley Bowles, Linda C. Babcock, and Kathleen McGinn,
"Constraints and Triggers: Situational Mechanics of Gender in
Negotiation."  89 J. Personality & Soc. Psychol. 951 (2005).  Other
studies show that women and men face different social incentives when
deciding whether to negotiate compensation, particularly when they
must negotiate with a male supervisor or evaluator.  *See* Bowles,
Hannah Riley; Babcock, Linda; Lai, Lei, "Social Incentives for Gender
Differences in the Propensity to Initiate Negotiations: Sometimes It
Does Hurt to Ask," 103 *Org. Behav. & Hum. Decision Processes*, 84
(2007).
[12] Dreves did not move for summary judgment on her federal EPA claim
even though the standard for liability is identical.

23

under both the federal and Vermont equal pay provisions is
denied.

## II.  Employment Discrimination

Dreves's claims of age discrimination under the Age
Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1)
and of age and gender discrimination under the VEFPA, Vt. Stat.
Ann. tit. 21, § 495(a)(1) are subject to the burden-shifting
standard articulated by the Supreme Court in *McDonnell Douglass
Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See Gorzynski v.
JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (noting
that the *McDonnell Douglas* framework continues to apply to ADEA
cases, although unlike the Title VII context, a plaintiff must
show that age was the "'but-for' cause of the challenged adverse
employment action") (quoting *Gross v. FBL Fin. Servs., Inc.*, 557
U.S. 167, 177 (2009); *Carpenter v. Cent. Vermont Med. Ctr.*, 743
A.2d 592, 594 (Vt. 1999).  To state a *prima facie* case under
both statutes, Dreves must show that she was (1) in a protected
age or gender group; (2) that she satisfactorily performed the
duties required by her position; (3) that she was subject to
adverse terms and conditions of employment; (4) and that those
terms and conditions occurred under circumstances giving rise to
an inference of discrimination.  *Gorzynski*, 596 F.3d at 107.
The employee has only a *de minimus* burden in establishing a
*prima facie* case.  *Chambers v. TRM Copy Centers Corp.*, 43 F.3d

29, 37 (2d Cir. 1994); *Carpenter*, 743 A.2d at 595 ("Plaintiff's burden of proof in the prima facie case is minimal.").  If Dreves can establish a *prima facie* case, the burden shifts to Hudson to produce and articulate a "legitimate clear, specific and non-discriminatory reason" for the adverse terms and conditions, after which Dreves would have the ultimate burden of proving that Hudson's explanation is pretext.  *Id.*  According to Hudson, Dreves has failed to establish that she was subject to adverse terms and conditions and that the facts as whole give rise to an inference of discrimination.  As noted above, Dreves has relinquished any claim that she was discriminatorily discharged.

A materially adverse change in working conditions must be "'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).  "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Id.* (quoting *Crady*, 202 F.2d at 136).  The federal courts that have directly considered whether understaffing meets this standard have not

25

reached any consensus. *See, e.g., Taylor v. Mills*, 892 F. Supp. 2d 124, 145 (D.D.C. 2012) (explaining that "whether an increased workload can qualify as an adverse employment action must always depend upon the particular factual circumstances of the workplace at issue" but suggesting that plaintiffs must do more than simply show increased workloads and scarce resources, which should be expected in any workplace). Because Dreves was the only salaried employee in Burlington, any understaffing of Hudson's operations there would have had a unique impact on her. The Court therefore presumes without deciding that understaffing in these circumstances can form the basis for a *prima facie* case. *See Turner v. Dist. of Columbia*, 383 F. Supp. 2d 157, 170 (D.D.C. 2005).

The evidence supporting Dreves's claim that the Burlington operation was staffed differently when she was manager is sufficient to establish a materially adverse condition of employment. The average total hours worked by Hudson employees during Dreves's last eight months, 316.67 per week, was significantly less than the average total hours worked by Hudson employees during Dixon's first year, 372.58. Viewed in the light most favorable to Dreves, these figures could support a finding that she experienced a materially adverse condition of employment during her final years as general manager of Hudson's Burlington operation.

Nonetheless, to the extent that any understaffing occurred, Dreves has failed to establish an inference that it was the product of either age or gender discrimination.  "When a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).  As with the other elements of her *prima facie* case, Dreves's burden is *de minimus*, but the proffered evidence must still show "circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Chambers*, 43 F.3d at 38.

The basis for such an inference is extremely thin.  In sum, it rests on three facts: (1) Dixon is a man and Dreves is a woman seventeen years his senior; (2) Dreves's general impression that Scorcia treated her differently than Faria and Dixon during her last year of employment; and (3) one of Dreves's performance reviews was automatically populated with male pronouns.  No reasonable jury, relying on these facts alone, could infer that Hudson intentionally understaffed the Burlington operation because of Dreves's age or sex.  The improper use of male pronouns on an automatically-generated form sheds no light on Hudson's staffing of the Burlington operation.

27

And Dreves's generalized allegation that she was treated differently is also insufficient to establish the inference. *See Dean v. Westchester Cnty. Dist. Attorney's Office*, 119 F. Supp. 2d 424, 430 (S.D.N.Y. 2000) ("[T]he general, conclusory allegations concerning the harassment of her and the treatment of similarly situated white, male employees fails to create an inference of discrimination."); *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 18, 834 A.2d 37, 45 (affirming summary judgment to the employer where the plaintiff relied her own bare allegations that she was treated differently from male executives).  For these reasons, Dreves fails to establish a prima facie case for age and gender discrimination.  Hudson's motion for summary judgment on these claims is therefore granted.  *See Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (affirming summary judgment for the employer where an employee failed to establish a *prima facie* case).

Even if the Court were to find that Dreves has established a prima facie case for employment discrimination, the Court would grant summary judgment to Hudson on Dreves's discrimination claims because she has failed to show that a reasonable jury could conclude, by a preponderance of the evidence, that Hudson's proffered explanations for the alleged

28

understaffing are pretext.  Gorzynski, 596 F.3d at 106;
*Robertson*, 2004 VT 15 ¶ 27-33, 848 A.2d at 321-24.[13]

Hudson has articulated several legitimate non-discriminatory reasons for the staffing disparities between Dreves's last year and Dixon's first year.  In 2008 and 2009, Hudson had a company-wide hiring freeze.  The substantial decrease in average hours total hours worked at Hudson's Burlington operation from 421.15 per week in 2008 to 332.54 per week in 2009 during those years is directly attributable to the hiring freeze.  There are no facts indicating that the staffing constraints experienced by Dreves in Burlington were any different from those suffered by general managers elsewhere at Hudson.  In addition, Dixon began his tenure in Burlington with extra staff because two employees who had been planning to leave decided to stay once they learned that Dreves was being terminated.  Finally, Hudson's sales in Burlington increased by more than twelve percent during Dixon's first year as general manager, thereby justifying the maintenance of higher staffing levels.

---

[13] The standard in age discrimination cases under ADEA is actually slightly higher: "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the *but-for cause* of the challenged adverse employment action and not just a contributing or motivating factor."). *Gorzynski*, 596 F.3d at 106 (emphasis added) (internal quotations omitted).  Dreves cannot show that age (or gender) was a contributing factor, much less a but-for cause of the understaffing she alleges.

"Proof that the defendant's explanation is unworthy of
credence is simply one form of circumstantial evidence that is
probative of intentional discrimination, and it may be quite
persuasive." *Reeves*, 530 U.S. at 147.  However, in this case,
Dreves cannot point to any facts that demonstrate that Hudson's
explanations for variances in its staffing levels in Burlington
are unworthy of credence.  That Hudson has presented several
explanations for the manner in which staffing decreased during
Dreves's tenure does not make them inconsistent.  The existence
of a hiring freeze, the accommodation of employees who wanted to
leave before they knew of Dreves's termination, and increased
sales in 2010-2011 are all perfectly compatible explanations.
For these reasons, Hudson would be entitled to summary judgment
on the discrimination claims even if the Court were to determine
that Dreves had established a prima facie case.  *See Smith v.
Am. Exp. Co.*, 853 F.2d 151, 154 (2d Cir. 1988) (Summary judgment
is appropriate where the employee "failed to supply any evidence
to support a finding that his employer's justifications were
merely a pretext for discrimination."); *Robertson*, 2004 VT 15, ¶
41, 848 A.2d at 327 (affirming summary judgment for the employer
where plaintiff failed to present sufficient evidence to rebut
defendants' explanation "beyond her own conclusory
allegations").

## III. Quasi-Contract

Dreves claims that she should be compensated for extra work she performed at Hudson's Burlington operation; however Hudson submits that the terms of her employment agreement are controlling and preclude her from obtaining additional compensation beyond that she negotiated and agreed to receive for her services.

The existence of a valid, express contract generally precludes quasi-contractual relief.  As the Restatement (First) of Restitution (1937) explains,

> A person of full capacity who, pursuant to a contract with another, has performed services or transferred property to the other or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, unless the transaction is rescinded for fraud, mistake, duress, undue influence or illegality, or unless the other has failed to perform his part of the bargain.

*Id.* § 107.  *See also* 26 Williston on Contracts § 68:1 (4th ed.). The Vermont Supreme Court has not addressed this issue; however, a state superior court has explained, consistent with the Restatement, that "[u]njust enrichment is a remedy available where there is no enforceable agreement between the parties, and the cause of action is one of quasi-contract." *Paige v. Fahey*, No. 133-5-08, 2009 Vt. Super. LEXIS 21 at *7 (Vt. Super. Ct. Mar. 19, 2009); *cf. City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir. 1988) (determining that under Connecticut

31

law, no quasi-contractual relief was appropriate where a valid
contract existed); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft
Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) (holding
that under New York law, failure to allege that a contract was
invalid or unenforceable precludes quasi-contractual relief for
events arising out of the same subject matter).[14]

Here, Dreves does not dispute the validity or
enforceability of her employment contract with Hudson.
Accordingly, she is not entitled to quasi-contractual relief for
the work she performed pursuant to her employment contract.
Hudson's motion for summary judgment is therefore granted with
respect to Dreves's quasi-contract claim.

**IV.  Unpaid Wages**

Dreves also seeks compensation for Hudson's failure to pay
her wages and compensate her for unused vacation time.  The
Vermont Employment Practices Act ("VEPA") requires that an
employee be paid within 72 hours of termination.  *See* Vt. Stat.
Ann. tit. 21, § 342(b)(2).  Hudson suggests that this claim is
moot because Hudson has already paid these wages; however, the
VEPA forfeiture provision allows for double recovery as long as
the employee files suit while the wages remain unpaid.  *Id.* at §

---

[14] Dreves cites *Hedges v. Schinazi* for the proposition that the
existence of a valid contract is irrelevant to the determination of
whether quasi-contractual relief is available; however, that case
simply holds that quasi-contract relief is available *in the absence of
a valid contract*.  144 Vt. 605, 607, 481 A.2d 1046, 1048 (1984).
*Hedges* is therefore consistent with the Restatement.

347.  Because Hudson did not pay Dreves until after suit was filed, Dreves's claim for unpaid wages is not moot, and Hudson's motion for summary judgment on this claim is denied.

### CONCLUSION

For the reasons stated, the Court grants summary judgment to Hudson on Dreves's employment discrimination and quasi-contract claims, denies summary judgment to Hudson on Dreves's unpaid wages and equal pay claims, and grants summary judgment to Dreves on the issue of Hudson's liability under her Vermont equal pay claim.

The heart of Dreves's complaint is that she was paid less than her male successor.  Though the ultimate responsibility of this Court is to explain how Vermont and federal law bears on the particular facts of Dreves's case, the Court is not blind to the larger problem it reflects.  The unequivocal promise of equal pay for equal work continues to go unrealized.  In 2012, women's median weekly earnings were 81 percent of men's.[15]  Not all of that disparity is the product of discrimination, whether intentional or otherwise, but at least ten percentage points of the gap is unexplained by measurable differences in male and female educational attainment, work experience, choice of

---

[15] United States Bureau of Labor Statistics, *Median usual weekly earnings of full-time wage and salary workers by selected characteristics, annual averages*, http://www.bls.gov/news.release/wkyeng.t07.htm (accessed June 6, 2013).

occupation, choice of industry, and other factors.[16]  Alarmingly,
women who have earned professional degrees, work longer hours,
or hold management positions are subject to some of the largest
pay disparities.[17]

In the fifty years since the passage of the Equal Pay Act,
we have taken significant strides towards parity.  In 1963, the
female to male earnings ratio was 60 percent and many of the
country's leading colleges and universities were admitting their
first female students.[18]  Today, the gap is markedly smaller, and
women outnumber and outperform men in higher education.[19]

That progress justifies confidence but not complacency.
The convergence of wages has slowed in recent years and in 2012,
the wage gap actually increased slightly.[20]  Any gap in the pay
of men and women, whether forty or ten or one percent, is an

---

[16] Francine Blau & Lawrence Kahn, *The Gender Pay Gap: Have Women Gone
as Far as They Can?*, Academy of Management Perspectives, Feb. 2007, at
7-23.
[17] *See* Bureau of Labor Statistics, *Highlights of Women's Earnings in
2011*, http://www.bls.gov/cps/cpswom2011.pdf, at *9 (accessed June 6,
2013) (showing an earnings ratio of 74.9 between women and men who
have earned a bachelors' degree or higher); *id.* at *10 (showing a pay
ratio of 71.6% for women in management, professional, and related
occupations)
[18] Blau and Kahn, 8.
[19] *See* David Autor and Melanie Wasserman, *Wayward Sons: The Emerging
Gender Gap in Labor Markets and Education*,
http://www.thirdway.org/subjects/143/publications/662 (accessed June
6, 2013); Tamar Lewin, *The New Gender Divide: At Colleges, Women Are
Leaving Men in the Dust*, N.Y. Times, July 9, 2006,
http://www.nytimes.com/2006/07/09/education/09college.html.
[20] Jillian Berman, *Gender Wage Gap Widened In 2012, As Women Workers
Were Held Back By Recovery*, The Huffington Post (March 7, 2013),
http://www.huffingtonpost.com/2013/03/07/gender-wage-gap-
2012_n_2830173.html.

implicit statement to our children that we value the work of our daughters less than that of our sons.  It sends a message that Congress, the Vermont General Assembly, and this Court reject.

On the whole, the federal and Vermont equal pay provisions are extremely forgiving.  Employers are not liable for pay disparities when those disparities are justified.  An employer can demonstrate that a pay gap is based on seniority, merit, or the quality or quantity of an employee's work.  An employer can also explain that a pay gap was caused by "any factor other than sex."  This final defense is a broad one, but it is not a license to assert any factor under the sun.  In the Second Circuit, and now also in Vermont, that defense is narrowly construed: factors other than sex must be gender-neutral, *bona fide*, and business-related.  They must also be capable of explaining the entirety of the pay gap alleged.

In this case, Hudson has not identified factors that meet this standard.  Even if the extent of the pay disparity between Dreves and her male successor is viewed in the light most favorable to Hudson, there is a gap of $4,939 that is unexplained by gender-neutral, *bona-fide*, and business-related factors.  Though an employer may have valid reasons to offer an employee a higher salary to induce him or her to take a job, "inducement" in and of itself is not a sufficient defense.  An employer may justify a pay disparity by showing that it sought

35

to induce an employee with better qualifications or greater experience than the claimant, but the Court is not presented with those circumstances in this case.  Finally, the fact that a male employee demanded and received a higher salary is not an acceptable justification for failing to provide a female employee with equal pay for equal work.  When an employer defends a pay disparity as the product of either "market forces" or, as here, a discrete negotiation in which a man demands a higher salary that a woman, the result is the same: the employer does not have a legally valid defense and the employee is entitled to summary judgment.

Dated at Burlington, in the District of Vermont, this 12th day of June, 2013.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge